UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| RICHARD LIVERMORE, Derivatively on Behalf of Nominal Defendant DEAN FOODS COMPANY, | ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | |
| | ) | |
| v. | ) ) | |
| GREG L. ENGLES, LEWIS M. COLLENS, TOM C. DAVIS, STEPHEN L. GREEN, JOSEPH S. HARDIN, Jr., JANET HILL, RONALD KIRK, JOHN R. MUSE, HECTOR M. NEVARES, PETE SCHENKEL, JIM L. TURNER, RICK FEHR, ALAN R. BERNON, DAIRY FARMERS OF AMERICA, INC., NATIONAL DAIRY HOLDINGS, L.P., SOUTHERN MARKETING AGENCY, INC., and DAIRY MARKETING SERVICES, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) | No. _____  (GREER/INMAN REQUESTED )  Jury Trial Demanded |
| | ) | |
| Defendants, | ) ) | |
| | ) | |
| and | ) ) | |
| DEAN FOODS COMPANY | ) ) | |
| | ) | |
| Nominal Defendant. | ) | |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by the undersigned attorneys, submits this Verified Shareholder Derivative Complaint on behalf of Dean Foods Company ("Dean Foods" or the "Company") against the defendants named herein.

### NATURE AND SUMMARY OF THE ACTION

1. Over the past decade, competition in the U.S. milk market has all but disappeared as a result of improper and illegal anticompetitive practices employed by Dean Foods. Certain

executive officers and directors of the Company (the "Individual Defendants" as further defined herein) established and continue to implement a scheme to illegally manipulate and control the marketplace. As the largest buyer and bottler of Grade A milk in the country, Dean Foods has restricted access by dairy farmers to the Company's Grade A milk bottling plants and has engaged in price-fixing. Dean Foods' anticompetitive conduct directed and implemented by the Individual Defendants has resulted in dairy farmers being drastically underpaid for the milk they produce and the American public being forced to pay unduly high retail prices for the milk it consumes.

2.      On December 21, 2001, Dean Foods was created through the merger of the two largest dairy companies in the United States (the "Merger"), Suiza Foods Corporation ("Suiza") and the former Dean Foods Company ("Former Dean Foods"). The Merger was heavily investigated by the Department of Justice ("DOJ"), which required substantial divestitures and other concessions to grant the Merger regulatory approval. Nevertheless, once the Merger was completed the Individual Defendants implemented their scheme to restrict dairy farmers' access to the Company's bottling plants and keep the prices it paid for raw Grade A milk artificially low, effectively creating a monopsony – a market with a single dominant buyer. These anticompetitive practices have seriously damaged the Company, as numerous antitrust actions have been brought by independent dairy farmers against Dean Foods. Moreover, while the Individual Defendants were engaging in these improper and illegal anticompetitive practices, artificially inflating the price of the Company's stock, certain of the Individual Defendants sold more than $256 million of Dean Foods common stock with the knowledge of and on the basis of these anticompetitive practices.

- 2 -

## JURISDICTION AND VENUE

3.     This court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.    This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

4.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a) and (c) as a substantial part of the events or omissions giving rise to the claim occurred in this District.  For example, Dean Foods has numerous subsidiaries located in the State of Tennessee that were complicit in the misconduct alleged herein.  Further, defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.  This action is related to the consolidated antitrust action styled *In re: Southeastern Milk Antitrust Litigation*, MDL No. 1899, Master File No. 2:08-MD-1000, that is currently pending in the U.S. District Court for the Eastern District of Tennessee.

## PARTIES

5.     Plaintiff Richard Livermore is a shareholder of Dean Foods, was a shareholder of Dean Foods at the time of the wrongdoing alleged herein, and has been a shareholder of Dean Foods continuously since that time.  Plaintiff Richard Livermore is a citizen of the State of Florida.

6.     Nominal Defendant Dean Foods is a corporation organized and existing under the laws of Delaware with its principal executive offices located at 2515 McKinney Avenue, Suite 1200, Dallas, TX 75201.  According to the Company's public filings, Dean Foods is one of the leading food and beverage companies in the United States.  Its Dairy Group segment is the largest processor and distributor of milk and other dairy products in the country, with products sold under more that fifty (50) local and regional brands and a wide variety of labels.  The Dairy

Group's net sales totaled $10.45 billion in 2007, or 88% of Dean Food's consolidated net sales. The current Dean Foods was formed in 2001 when the company's predecessor Suiza merged with Former Dean Foods and changed the name of the combined company to Dean Foods Company.

7.     Defendant Gregg L. Engles ("Engles") has served as a director of Dean Foods and its predecessor Suiza since October 1994. Engles served as Chief Executive Officer and Vice Chairman of the Board from December 2001 to April 2002, at which point he  was elected Chairman of the Board. Prior to the formation of the current Dean Foods, Engles served as Chairman of the Board and Chief Executive Officer of certain predecessor companies, including Suiza.  He has been a member of the Executive Committee of the Board (the "Executive Committee") since 2001 and was a member of the Strategic Planning Committee of the Board (the "Planning Committee") from 2001 to 2008.[1] .Upon information and belief, Defendant Engles is a citizen of the State of Texas.

8.     Defendant Lewis M. Collens ("Collens") has served as a director of the Company since December 2001, when he was elected to the Board in connection with Suiza's acquisition of Former Dean Foods. Collens served on the Board of Directors of Former Dean Foods from 1991-2001. Collens has been a member of the Audit Committee of the Board (the "Audit Committee") since 2001. Upon information and belief, Defendant Collens is a citizen of the State of Illinois.

9.     Defendant Tom C. Davis ("Davis") has served as a director of the Company since March 2001. Davis has been a member of the Audit Committee since 2004 and served on the

---

[1] The Company's April 21, 2008 Proxy Statement indicates that the Planning Committee was dissolved during the first quarter of 2008.  However, the Company's website still indicates the existence of a Planning Committee comprised of Defendants Engles, Green, Hardin and Kirk.

Planning Committee from 2001 to 2003. Upon information and belief, Defendant Davis is a citizen of the State of Texas.

10.     Defendant Stephen L. Green ("Green") has served as a director of Dean Foods and its predecessor Suiza since October 1994. Green has been a member of the Audit Committee and the Compensation Committee of the Board (the "Compensation Committee") since 2001, a member of the Executive Committee since 2007 and was a member of the Planning Committee from 2001 to 2008. Upon information and belief, Defendant Green is a citizen of the State of Connecticut.

11.     Defendant Joseph S. Hardin, Jr. ("Hardin") has served as a director of Dean Foods and its predecessor Suiza since May 1998, and currently serves as the company's Lead Director. Hardin has been a member of the Compensation Committee since 2001, the Governance Committee of the Board since 2002 and the Executive Committee since 2003. Previously, Hardin served on the Nominating Committee of the Board (the "Nominating Committee") in 2001 and the Planning Committee from 2001 to 2008. Upon information and belief, Defendant Hardin is a citizen of the State of California.

12.     Defendant Janet Hill ("Hill") has served as a director of the Company since December 2001, when she was elected to the Board in connection with Suiza's acquisition of Former Dean Foods. Hill served on the Board of Directors of Former Dean Foods from 1997 to December 2001. Hill has served as a member of the Governance Committee since 2002 and served on the Nominating Committee in 2001. Upon information and belief, Defendant Hill is a citizen of the Commonwealth of Virginia.

13.     Defendant Ronald Kirk ("Kirk") has served as a director of the Company since February 2003. Kirk has served on the Governance Committee since 2006 and was a member of

the Governance Committee in 2003 and the Planning Committee from 2004 to 2008.  Upon information and belief, Defendant Kirk is a citizen of the State of Texas.

14.     Defendant John R. Muse ("Muse") has served as a director of Dean Foods and its predecessor Suiza since November 1997.  Muse has served as a member of the Compensation Committee since 2007.  Upon information and belief, Defendant Muse is a citizen of the State of Texas.

15.     Defendant Hector M. Nevares ("Nevares") has served as a director of Dean Foods and its predecessor Suiza since 1994.  Nevares was President of Suiza Dairy (Puerto Rico) from June 1983 until September 1996, having served in additional executive capacities at Suiza Dairy (Puerto Rico) since June 1974.  Nevares served as a consultant for Suiza from March 1998 until April 2000.  Nevares has served as a member of the Audit Committee since 2005, and served as a member of the Compensation Committee from 2004 to 2005 and as a member of the Executive Committee from 2001 to 2003.  Upon information and belief, Defendant Nevares is a citizen of the Territory of Puerto Rico.

16.     Defendant Pete Schenkel ("Schenkel") has served as a director of Dean Foods and its predecessor Suiza since January 2000.  Schenkel joined the Board of Directors of Suiza in January 2000 in connection with the acquisition of Southern Foods Group that formed Suiza Dairy Group ("SDG").  Schenkel also served as President of SDG until the Merger and then he became the President of Dean's Dairy Group until he retired from the position on December 31, 2005.    Schenkel served as a member of the Executive Committee from 2003 to 2005.  Upon information and belief, Defendant Schenkel is a citizen of the State of Texas.

17.     Defendant Jim L. Turner ("Turner") has served as a director of Dean Foods and its predecessor Suiza since January 2000.  Turner has served as a member of the Governance

Committee since 2002 and as a member of the Compensation Committee since 2005. Previously, Turner served as a member of the Audit Committee and the Planning Committee from 2001 to 2003 and as a member of the Nominating Committee in 2001. Upon information and belief, Defendant Turner is a citizen of the State of Texas.

18.     Defendant Rick Fehr ("Fehr") has served as Senior Vice President, Business Optimization of the Company since November 2006. Previously, Fehr served as Chief Operating Officer of the Southeast Region from February 1998 to December 2005, and after a regional realignment served as Chief Operating Officer of the East Region from January 2006 to November 2006. Upon information and belief, Defendant Fehr is a citizen of the State of Texas.

19.     Defendant Alan J. Bernon ("Bernon") served as a director of Dean Foods and its predecessor Suiza from 1997 until his resignation on May 29, 2008. Bernon also served as Chief Operating Officer of Dean Foods' Northeast Region as well as a member of the Company's management team until May 29, 2008. Upon information and belief, Defendant Bernon is a citizen of the State of Texas.

20.     Defendant Dairy Farmers of America, Inc. ("DFA") is a Kansas corporation with its headquarters located in Kansas City, Missouri. DFA is the largest dairy cooperative in the United States. DFA currently represents more than 18,000 dairy farmers in 48 states. DFA controls about one-third of dairy farm milk supply in the United States. DFA was formed in 1998 by joining four of the nation's leading dairy cooperatives, Associated Milk Producers, Inc., Mid-America Dairymen, Inc., Milk Marketing, Inc. and Western Dairymen Cooperative, Inc. DFA is a not-for-profit corporation. Since its inception in 1998, DFA has made substantial investments in the milk processing business, and in particular, in the Grade A milk bottling business. Through joint ventures, DFA has positioned itself as a national player and has become

- 7 -

the fourth largest processor of Grade A milk in the country. DFA fully or partially owns eight fluid Grade A milk bottling plants (not including NDH, as defined below) and is the third largest fluid Grade A milk bottler in the Southeast.

21.     Defendant National Dairy Holdings, L.P., ("NDH") is a Delaware limited partnership with its headquarters located in Dallas, Texas. NDH is a Grade A milk bottling company that is a subsidiary of DFA that manages and operates all of DFA's fluid Grade A milk bottling plants. In 2001, Alan A. Meyer and two former high-level Suiza executives, Cletes O. "Tex" Beshears (Vice Chairman of the Board of Directors, President & COO) and Tracy Noll (CFO), joined with DFA as investors to create NDH. Meyer serves as the Chief Executive Officer of NDH. The purpose of forming NDH was so that Dean Foods could meet certain requirements imposed by the DOJ in order to approve the Merger. Specifically, the DOJ required that Former Dean Foods divest 11 bottling plants before merging with Suiza, so Dean Foods, along with DFA and Meyer, created NDH to acquire the bottling plants in order to give the appearance that there was greater competition in the bottling market. Upon its formation, NDH became the second largest fluid Grade A milk bottler in the country. NDH owns at least nine fluid Grade A milk bottling plants in the Southeast and is the second largest fluid Grade A milk bottler in the Southeast.

22.     Defendant Southern Marketing Agency, Inc., ("SMA") is a Kentucky not-for-profit corporation with its headquarters located in Louisville, Kentucky. SMA is a milk marketing agency that operates exclusively in the Southeast. SMA began operating in April 2002 and its members include a number of independent dairy farmers and dairy cooperatives, including DFA. SMA is an entity created and controlled by DFA in order to further its conspiracy with Dean Foods to illegally control the milk market in the Southeast. The purpose

- 8 -

of SMA is to market all Grade A milk sold in the Southeast by DFA's cooperative members and the independent dairy farmers that still exist in the region. Dean Foods and DFA use SMA to monitor prices for raw Grade A milk paid to independent dairy farmers and cooperatives other than DFA in order to fix prices for raw Grade A milk paid to dairy farmers throughout the Southeast market.

23.     Defendant Dairy Marketing Services, LLC, ("DMS") is Delaware corporation with its headquarters located in Syracuse, NY. DMS markets Grade A milk for independent dairy farmers and cooperatives. DMS, like SMA, is an entity created and controlled by DFA in order to further its conspiracy with Dean Foods. DFA has used DMS as a front organization to mislead dairy farmers who are scared of DFA's tactics and erroneously think that DMS is distinct from DFA. DMS has regional offices across the United States. DMS's primary focus is improving the efficiency of hauling milk. DMS was formed in 1999 through an agreement between DFA and another dairy cooperative in the Northeast. Since its inception, DMS has become a dominant player in the milk marketing business in the Southeast. DFA is DMS's largest fluid Grade A milk customer. DMS is controlled by DFA. As is the case with SMA, DMS has assisted Dean, DFA and NDH to monitor prices paid for raw Grade A milk in order to fix prices for raw Grade A milk paid to dairy farmers throughout the Southeast market.

24.     Collectively, Defendants Engles, Collens, Davis, Green, Hardin, Hill, Kirk, Muse, Nevares, Schenkel and Turner are referred to herein as the "Director Defendants."

25.     Collectively, Defendants Engles, Collens, Davis, Green, Hardin, Hill, Kirk, Muse, Nevares, Schenkel, Turner, Fehr and Bernon are referred to herein as the "Individual Defendants."

26.     Collectively, Defendants DFA, NDH, SMA and DMS are referred to herein as the "Co-conspirator Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

27.     By reason of their positions as officers, directors, and/or fiduciaries of Dean Foods and because of their ability to control the business and corporate affairs of Dean Foods, the Individual Defendants owe Dean Foods and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Dean Foods in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Dean Foods and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Dean Foods and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Dean Foods, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Dean Foods, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

29.     To discharge their duties, the officers and directors of Dean Foods were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Dean Foods were required to, among other things:

a.      exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

b.      exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with the Company's by-laws and all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

c.      refrain from acting upon material inside corporate information to benefit themselves.

30.     Additionally, the Company's Code of Ethics, which applies to all directors, officers and employees of Dean Foods, states, among other things, the following:

This Code of Ethics is intended to inform all directors, officers and employees of Dean Foods Company and its subsidiaries of their ethical obligations.  As you will see, we have set a high standard of conduct. Adherence to this Code of Ethics is vital to maintaining a business in which we may all take pride and is paramount to our continued success.

*       *       *

Our Company is committed to doing business with honesty and integrity. Each and every one of us is expected to comply with the Code of Ethics at all times. A lone violation of this Code of Ethics by any individual could have devastating consequences for our stakeholders, our Company and the livelihoods of us all. Even the appearance of improper behavior is unacceptable.

*       *       *

**Antitrust and Competition Law** Many routine business activities can present issues and challenges under the antitrust laws. If you are involved with establishing our prices or terms of sale, bidding for contracts, or dealing with customers, distributors or suppliers, you are expected to be familiar with the antitrust laws applicable to our business and will receive

special antitrust compliance training. Understanding and complying with antitrust laws is essential to our continued success. At a minimum, you should never:

- make any agreement with a competitor regarding pricing of our products in the marketplace, pricing practices, bids, bidding practices, terms of sale or marketing practices;

- agree with a competitor to coordinate or allocate bids;

- divide customers, markets or territories with a competitor;

- agree with a competitor not to deal with another company;

- attempt to control a customer's resale price;

- illegally discriminate unfairly between customers regarding price or other terms;

- illegally force a customer to buy one product in order to get another product;

- or engage in any other unfair methods of competition or deceptive acts or practices.

Our Legal Department can advise you on what conduct is or is not permissible under the antitrust laws. Under the antitrust laws, a prohibited agreement with a competitor or customer does not have to be a written contract or involve an express commitment. A "nod and wink" tacit understanding or even silent approval may be sufficient. Since we operate in a highly competitive environment in which prices may be similar among competitors, it is important to avoid even the appearance of an illegal agreement. Therefore, it is our policy that (unless it has been approved by our Legal Department) you may not discuss with any competitor any sensitive subject such as customer pricing, bids or bidding practices, costs, production levels, selling strategies, terms or conditions of sale, market shares, territories or customer lists. If, for [sic] turns to prohibited subjects, you must not participate in the discussion. Instead, you should leave the meeting, if necessary, and promptly report the incident to our Legal Department. Similarly, you must never send or receive any information of a type described above directly to or from a competitor.

*        *        *

**Securities Trades** If you possess any material information about our Company that we have not yet disseminated to the public, you must not buy or sell our stock or other securities of the Company, including options,

puts, calls and other derivatives; pass such information on to anyone else (even to other employees, unless they have a business need to know); or engage in any other action to take advantage of any non-public material information.

"Material" information includes any information an investor would consider important in deciding whether to buy or sell our securities. Either positive or negative information may be "material."

31. Accordingly, the Company's Code of Ethics imposes additional obligations, duties and responsibilities on the Individual Defendants to operate the Company in an ethical manner. Moreover, the Company's Corporate Governance Principles set forth the following "responsibilities of the Board of Directors of the Company":

1. Represent the interests of the Company's shareholders in maintaining and enhancing the success of the Company's business, including optimizing long-term returns to increase shareholder value.

2. Select and evaluate a well-qualified Chief Executive Officer ("CEO") of high integrity, and approve other members of the senior management team.

3. Oversee and interact with senior management with respect to key aspects of the business including strategic planning, management development and succession, operating performance, and shareholder returns.

4. Provide general advice and counsel to the CEO and senior executives.

5. Adopt and oversee compliance with the Company's Code of Ethics. Promptly disclose any waivers of the Code of Ethics for Directors or executive officers.

6. Formally evaluate the performance of the CEO and senior management each year in executive sessions.

32. The Company's internal governance documents impose a heightened fiduciary responsibility on the Individual Defendants, such that they must comply with the requirements of those documents in managing and directing the Company.

## FACTUAL ALLEGATIONS

### Definitions

33. The following entities and individuals are relevant to this complaint:

34.   **"SDG" means** Suiza Dairy Group, a subsidiary of Suiza that owned and operated all of Suiza's milk bottling plants.  In January of 2000, DFA entered into a joint venture with Suiza and formed SDG.  Suiza contributed all of its fluid Grade A milk bottling operations to SDG, and DFA contributed its share of Southern Foods Group, L.P., a joint venture between DFA, Defendant Schenkel and Meyer (as defined below).  Through the joint venture, DFA received a 33.8% ownership stake in SDG.  After DFA and Suiza purchased Defendant Schenkel's stake in SDG for $100 million, Defendant Schenkel was elected to the Board of Directors of Suiza in January 2000.  Schenkel has served as a Director of Dean Foods since Suiza merged with the Former Dean Foods.

35.   **"Mid-Am"** means Mid-Am Capital, LLC, a subsidiary of DFA.  Mid-Am was formed by DFA and Dean Foods and other individuals to provide capital to and make equity investments in dairy processing and fluid Grade A milk bottling operations.  Upon information and belief, DFA management has invested tremendous amounts of DFA member dairy farmers' monies and equity, and borrowed more than $1 billion, to finance DFA's acquisitions of Grade A milk processing operations identified in the preceding paragraphs, and other properties.  Mid-Am also provided NDH with more than $400 million in financing in order to purchase the 11 bottling plants that were divested by the Former Dean Foods and Suiza during the merger.

36.   **"Meyer"** means Alan A. Meyer, a founder and owner of Southern Foods Group with DFA and Schenkel.  Southern Foods Group eventually merged with Suiza's bottling operations to form SDG.  Meyer is also a founder and partial owner of NDH.  Today, Meyer is the Chief Executive Officer of NDH.

37.   **"Baird"** means James Baird, the manager of SMA and the principal owner of Lone Star Milk Transport, Inc., BullsEye Transport, LLC and BullsEye Logistics, LLC

(collectively "BullsEye"). Baird is also an officer, director, and general manager of Lone Star, a dairy cooperative based in Texas. Dean Foods and DFA have agreed to use BullsEye to transport Grade A milk produced by SMA's member cooperatives. Upon information and belief, Baird transports unnecessarily large quantities of Grade A milk for SMA from the Southwest to the Southeast, and also transports Grade A milk for SMA unnecessarily long distances within the Southeast.

**Overview**

38.     Over the past two decades, competition in the U.S. milk market has eroded drastically. The decline in competition is a deliberate strategy between Dean Foods, the largest milk processor in the country, and DFA, the largest dairy farmers' cooperative in the country. Dean Foods' and DFA's antitrust conspiracy to illegally manipulate and control the milk market doubly taxes society. First, dairy farmers are drastically underpaid for the milk they produce, and second, the public is forced to pay unduly high retail prices for the milk it consumes.

39.     Because Dean Foods and DFA have nearly total control of all the milk produced and bottled in the Southeast region of the United States, the effects of the conspiracy are manifest. Production in the region has declined, yet contrary to what would be expected if the market were functioning properly, the prices that dairy farmers in the Southeast have received for their milk has also declined.

40.     In fact, the Merger was merely the natural extension of the anti-competitive conduct being practiced by the Former Dean Foods, Suiza, and DFA prior to the Merger. Dean Foods and DFA have continued their improper behavior, resulting in a rigged system that continues to harm producers and consumers of milk, for the benefit of Dean Foods. As a result of Dean Foods' and DFA's manipulation of the milk market, the number of dairy farmers in the United States has decreased substantially.   According to the United States Department of

Agriculture ("USDA"), from 1997 to 2007 the number of dairy farmers in the country has declined from approximately 99,000 to 59,000.

41.   In the Southeast, Dean Foods and DFA have effectively established a monopsony within the milk bottling market. In economics, a monopsony is a market form in which only one buyer faces many sellers. It is an example of imperfect competition, similar to a monopoly, in which only one seller faces many buyers. As the only purchaser of a good or service, the "monopsonist" (in this case, Dean Foods) may dictate terms to its suppliers in the same manner that a monopolist controls the market for its buyers.

42.   As a result of the monopsony, Dean Foods has generated and continues to generate artificially high profits, and DFA's market power, at the direction of Dean Foods, has become a tool used against dairy farmers.

**The Milk Business**

43.   Milk is produced in all 50 States and is primarily produced by individuals or families who own and operate their own dairy farms.

44.   Milk comes in two different categories, Grade A and Grade B. Grade A milk is the highest quality milk that is produced in the United States. Grade A milk is eligible for use in fluid products, while Grade B milk is only eligible for the production of manufactured dairy products, such as cheese, butter and milk powder. The Grade A milk market is regulated by the federal government; the Grade B milk market is not. Today, most milk that is produced in the United States meets Grade A milk standards; however, according to the USDA, only about one-third of the Grade A milk that is produced each year is actually processed into fluid milk and cream products.

45.     Grade A milk is highly perishable, and therefore, it is produced on a daily basis. Cows are milked each day on the dairy farm and milk is then stored in refrigerated tanks until it is picked up and delivered to a bottling plant.    Milk is usually picked up and delivered to a bottling plant on a daily basis by a milk hauler. At the bottling plant, the milk is processed and packaged for human consumption. The bottling plant then sells the milk wholesale or retail.

46.     Most dairy farmers do not sell their Grade A milk directly to milk bottlers; rather, they sell through a dairy cooperative. A dairy cooperative is an association of dairy farmers who agree to collectively "market" their milk. The marketing process generally consists of locating buyers, negotiating sales prices, coordinating the hauling process, recording and reporting data for market regulation purposes, conducting sanitation testing, and processing payments to its members. The reason a dairy farmer would want to become a member of a dairy cooperative is because of the increase in bargaining power that comes out of the individual dairy farmers acting collectively. Hypothetically, if a farmer were independently able to sell 1 Lb of milk to a dairy processor for $1.50 and a dairy cooperative could use its bargaining power to sell that same 1 Lb of milk for $1.80, the farmer would be happy to go through a cooperative as long as the cooperative charged the farmer less than $0.30 to sell the 1 Lb of milk.

47.     A dairy cooperative is member-owned or member-controlled and operated for the exclusive benefit of its members.    Most importantly, the goal of a cooperative is to get the highest price possible for the raw milk produced by its farmers.

48.     While the majority of dairy farmers belong to dairy cooperatives, there are dairy farmers that are not members of a dairy cooperative.    These farmers are referred to as "independent dairy farmers." These farmers market their milk directly to bottling plants.

49.     The milk business is a highly regulated industry, and therefore it does not operate within a traditional competitive market environment.  There are both federal and state regulations that govern sanitation standards as well as market variables, such as pricing and output.

50.     There are certain characteristics of milk and economic conditions of the milk industry that explain why the government has chosen to implement regulatory schemes.  These characteristics include, but are not limited to the following:

        a.     Milk is a perishable product and must be harvested daily.

        b.     Producers outnumber processors (bottlers) 20 to 1.

        c.     Health regulations are insufficient to assure an adequate supply of milk.

        d.     Production is highest when demand for fluid milk is at a season low.

        e.     Milk is viewed as a necessary food item, particularly for children.

51.     Without government intervention, there is a strong potential for volatile production and improper marketing practices.  Supply and demand within the milk market would be out of balance for extended periods of time, resulting in much greater volatility in the price of milk.

52.     Pursuant to the 1937 Agricultural Marketing Agreement Act ("AMAA"), the USDA establishes minimum prices for the sale of raw Grade A milk depending on the "Class" for which the milk is to be used.  The Secretary of the USDA classifies Grade A milk into four classes:

        - Class I:  Class I milk is used in beverage milk products for human consumption.

        - Class II:  Class II milk is commonly used to manufacture cream products such as yogurt, sour cream, cottage cheese, and ice cream.

- Class III:  Class III milk is used to produce hard manufactured cheeses and cream cheese.

- Class IV:  Class IV milk is used to produce butter and any milk in dry form.

53.     USDA minimum prices for Grade A milk represent the minimum price that fluid Grade A milk bottlers must pay for each class of Grade A milk that is sold pursuant to USDA regulation.  Class I is the most expensive because its end-use is solely fluid.  Classes II, III and IV are used to manufacture non-fluid dairy products, and therefore minimum prices for these Classes of milk are lower than the price paid for Class I milk.  Pursuant to the AMAA, prices for each Class are calculated on a monthly basis.

54.     In addition to class distinctions to establish minimum prices for the sale of raw Grade A milk, the AMAA instructs the USDA to divide the country into different regions.  Thus, on a monthly basis, the Secretary of the USDA not only calculates minimum prices for each class of Grade A milk (Class I through Class IV), but also calculates specific prices for each class in each geographic region of the country.

55.     The geographic break up of the country into regions is referred to as the Federal Milk Market Ordering system.  Each geographic region of the country is referred to as a Federal Milk Market Order ("FMMO" or "Order").  Currently, there are 10 Orders in United States.

56.     Orders 5 and 7 cover the Southeast region of the country and represent the geographic region that is pertinent to this complaint.  Order 5 consists of raw Grade A milk produced in North Carolina, South Carolina, and portions of Georgia, Indiana, Kentucky, Tennessee, Virginia, and West Virginia.  Order 7 consists of raw Grade A milk produced in Alabama, Arkansas, Mississippi, Louisiana, and parts of Florida, Georgia, Kentucky, Missouri, and Tennessee.

57.    As mentioned above, Class I fluid Grade A milk is not interchangeable with Class II, III or IV Grade A milk because Class II, III and IV constitute non-fluid end-uses, and therefore they are less valuable.  Nevertheless, when raw Grade A milk is sold to a bottler, the milk is not predetermined to be milk of a particular Class.  Instead, dairy farmers are paid a weighted average, or "blend," price for all uses of milk in a particular Order.  This process is referred to as "pooling."

58.    USDA regulations mandate that fluid Grade A milk bottlers pay at least the weighted uniform average or minimum blend price for fluid Grade A milk that is pooled in an Order.  Processors (both fluid bottlers and other non-fluid processors) pay into or draw milk out of a particular pool on the basis of their utilization of milk relative to the market average utilization for the Order.

59.    Dairy farmers participating in the pool receive identical uniform blend prices, with certain adjustments such as the location of the bottling plant to which the milk is delivered.

60.    As a result of changes in production and demand as well as uneven distribution, milk prices frequently differ between Orders.  One major factor is seasonal change.  In Orders 5 and 7, where demand for bottled fluid Grade A milk often exceeds Grade A milk production, Class I utilization has traditionally exceeded 70 percent of the Grade A milk provided for processing.  In other regions, such as the Southwest, where demand for bottled fluid Grade A milk does not exceed Grade A milk production, the percentage of Class I utilization may often be as low as 40 percent.

61.    Orders with high Class I utilization generally have higher FMMO minimum blend prices than Orders with lower Class I utilization.

62.    Traditionally, because of supply and demand in the marketplace, as well as cooperatives and independent dairy farmers negotiating with milk bottlers for prices for raw milk that exceed the FMMO prices, processors and bottlers have paid prices for classes of Grade A milk that are above the FMMO prices established each month by the USDA.

63.    The amount by which the price for Grade A milk exceeds the FMMO price is generically referred to as an "over-order payment" or an "over-order premium." For Orders 5 and 7 in particular, it is important to note that dairy farmers depend on delivering as much milk as possible to fluid Grade A milk bottlers because providing milk to non-fluid processors is far less valuable, as non-fluid processors do not pay over-order payments. This is not always the case for Grade A milk produced and sold within other Orders around the country.

64.    The actual price a dairy farmer receives for Grade A milk is known as the "mailbox price." The mailbox price that a dairy farmer receives is comprised of the federal minimum price, plus any over-order premium, and any bonus for volume and/or quality, minus any marketing costs that were incurred. Marketing costs are expenses incurred by the dairy cooperative on behalf of its member farmers, and they include, among other things, the costs of locating buyers, negotiating sales prices, coordinating the hauling process, recording and reporting data for regulatory purposes, performing sanitation testing, and processing the payments to its farmers.

65.    In Orders 5 and 7, historically, demand often exceeded supply of Grade A Class I Grade A milk and fluid Grade A bottlers had to make over-order payments to secure the milk necessary for processing. As a result, mailbox prices were higher than FMMO prices. This is no longer the case. Through the conspiracy established and orchestrated by Dean Foods and DFA, and several affiliate entities controlled by Dean Foods and DFA, mailbox prices have been fixed

and kept artificially lower than they would be if the market were to operate in a lawful competitive environment.

## The Southeast Dairy Market

66.   Dean Foods and DFA (through its bottling operations that are operated by its subsidiary NDH) own at least 33 of the approximately 51 fluid Grade A milk bottling plants that operate in the Southeast. These 33 plants, upon information and belief, represent 77 percent of the fluid Grade A milk bottling capacity in the Southeast. Dean Foods and DFA have behaved in an anticompetitive manner in the Southeast more so than in any other region of the country.

67   DFA has full-supply agreements with — and control over access to — these 33 plants. This means that DFA has the exclusive right to serve as the supplier of raw Grade A milk to these plants. As a result of these full-supply agreements, and because dairy farmers depend on access to bottling plants in their region for their livelihood, DFA has manipulated the market so that dairy farmers in the Southeast have little choice but to go through DFA in order to sell their milk within the region.

68.   The supply of fluid Grade A milk is integral to the operation of fluid Grade A milk bottling plants owned by Dean Foods. Upon information and belief, approximately 85 percent of Dean Foods' revenues are derived from sales of processed Grade A milk products. Through its conspiracy with DFA, Dean Foods controls the prices paid for raw Grade A milk. By controlling Grade A milk prices in the Southeast, Dean has depressed, fixed and stabilized the prices paid for raw Grade A milk in the region, and this has substantially increased its profit margins.

## The Merger

69.   During the 1990s, the dairy industry experienced a period of systematic consolidation. Upon information and belief, many of the fluid Grade A milk bottling plants

- 22 -

acquired by Suiza, the Former Dean Foods and DFA during their unprecedented, rapid consolidation of the 1990s were purchased at extremely high price-to-revenue or price-to-profit multiples. The unprecedented consolidation in the dairy industry culminated in 2001 with the Merger between the Former Dean Foods and Suiza.

70.    After the Merger, Dean Foods emerged as the largest milk processor of fluid Grade A milk in the country. Dean Foods also became the largest fluid Grade A milk bottler in the Southeast.

71.    Before the Merger, DFA controlled more than 50 percent of the Grade A milk produced in the Southeast. At that time, DFA was also the fourth largest milk processor in the United States. Before the Merger, DFA owned a 33.8% stake in SDG, Suiza's milk bottling subsidiary. Today, DFA controls approximately 90 percent of the fluid Grade A milk produced in the Southeast.

72.    Starting in the spring of 2001, Suiza and Former Dean Foods began formally working on plans to merge the two companies. The two companies anticipated that the DOJ would have antitrust concerns with regard to the Merger, and they were correct.

73.    The DOJ was concerned that the Merger would impact both horizontal and vertical aspects of the milk market. The horizontal implications of a merger between the two biggest dairy processors in the country were obvious: if the Merger were consummated, the two major national competitors in the milk processing business, and therefore, the two largest purchasers of raw Grade A milk in the country, would consolidate their power and stifle competition.    With regard to the vertical implications, the DOJ was concerned about Dean Foods' resulting relationship with DFA. First, DFA owned a 33.8% share of SDG. Second,

- 23 -

Suiza had a full-supply agreement with DFA that gave DFA the exclusive right to provide fluid Grade A milk to all of Suiza's bottling plants.

74.     Former Dean Foods, Suiza and DFA made plans to circumvent the DOJ's concerns because their ultimate goal, in furtherance of the conspiracy, was to achieve the market conditions that the DOJ precisely sought to prevent. Furthermore, all three companies were specifically aware of how their consolidation would impact the milk market in the Southeast.

75.     Beginning at least as early as February 22, 2001, at the Quarterly Meeting of the Suiza Board of Directors, Suiza directors had detailed discussions about the potential antitrust implications of the proposed merger. Defendant Engles, the Chairman of the Suiza Board of Directors and Chief Executive Officer of Suiza, who would later become the Chairman of the Board and Chief Executive Officer of Dean Foods, led these conversations and was integral to devising the strategy to skirt the DOJ's concerns. The discussions about the antitrust implications of the merger continued both in Special Meetings of the Suiza Board of Directors and during the usual meetings of the Suiza Board of Directors throughout the year.

76.     After months of negotiations with the companies, the DOJ established several conditions that would have to be met by the two companies in order to approve the Merger. The DOJ required that the Former Dean Foods and Suiza take the following actions:

    a.      The merged company would divest 11 fluid Grade A bottling plants;

    b.      The merged company would buy out DFA's 33.8% share in SDG; and

    c.      The merged company would modify the full-supply agreement between Suiza and DFA so that the merged company could buy raw Grade A milk from producers other than DFA.

77.     Throughout the negotiations, it was evident that Suiza's and Former Dean Foods' primary goal was to consolidate milk production as much as possible and get as many dairy farmers, independent dairy farmers, and other dairy cooperatives as possible to go through DFA in order to sell raw milk to the merged company.

78.     Taking into account the DOJ's conditions, Former Dean Foods and Suiza structured the Merger as follows:

  a.     Suiza would acquire all outstanding shares of Former Dean Foods for an exchange of $21.00 in cash and .429 shares of the newly formed company;

  b.     Suiza's Board of Directors, consisting of 10 directors, would become the Dean Foods' Board of Directors.   In addition, Suiza would add five Former Dean Foods' assignees to the Dean Foods' Board of Directors. Thus, the Board of Directors of the newly formed company would have 15 total directors;

  c.     Upon the completion of the Merger, the newly formed company would continue operating under the name "Dean Foods Company";

  d.     Dean Foods would divest 11 fluid Grade A bottling plants to NDH;

  e.     Dean Foods would buy out DFA's 33.8% share in SDG for $166 million in cash and a subordinated promissory note in the principal amount of $50 million (the "Note"); and

  f.     Dean Foods would modify the full-supply agreement between Suiza and DFA to require the newly merged company to pay DFA up to $80 million in liquidated damages for breaching the agreement.

79.     On November 15, 2001, Suiza held its Quarterly Meeting of its Board of Directors. Again, the Suiza Board of Directors discussed the status of the DOJ's review of the proposed merger. The Suiza Board of Directors specifically discussed the DOJ's concern with regard to the Company's relationship with DFA and NDH.

80.     On December 5, 2001, at a Special Meeting of the Board of Directors of Suiza, Defendant Engles informed the Suiza Board of directors about the most recent response of the DOJ, *i.e.*, that the proposed actions that the Suiza Board of Directors had agreed to take to satisfy the DOJ's antitrust concerns surrounding the Merger were still not sufficient for DOJ to approve the Merger.

81.     The DOJ further required the Company to "loosen" its relationship with NDH by amending the payments provisions of the Note and the liquidated damages payable to DFA. With regard to the full-supply agreement with DFA, the Suiza Board of Directors agreed that the Company would modify its agreement with DFA such that the Company would pay DFA up to $47 million in liquidated damages, as opposed to the $80 million that was originally proposed and approved by the Suiza Board. The Company also agreed to exclude from the operation of the $50 million Note and the liquidated damages provisions certain markets where the Company and NDH would compete most heavily.

82.     On December 21, 2001, the Suiza Board of Directors voted on the final terms of the Merger that it had agreed upon with the DOJ:

> a.     Suiza would acquire all outstanding shares of Former Dean Foods for an exchange of $21.00 in cash and .429 shares of newly formed company;
>
> b.     Suiza's Board of Directors, consisting of 10 directors, would become the Dean Foods' Board of Directors.  In addition, Suiza would add five

Former Dean Foods' assignees to the Dean Foods' Board of Directors. Thus, the Board of Directors of the newly formed company would have 15 total directors;

c.   Upon the completion of the Merger, the newly formed company would continue operating under the name "Dean Foods Company";

d.   Dean Foods would divest 11 fluid Grade A bottling plants to NDH;

e.   Dean Foods would buy out DFA's 33.8% share in SDG for $166 million in cash and a subordinated promissory note in the principal amount of $50 million (the "Note");

f.   Dean Foods would modify the full-supply agreement between Suiza and DFA to require the newly formed company to pay DFA up to $47 million in liquidated damages for breaching the agreement; and

g.   Dean Foods would exclude from the operation of the $50 million Note and the $47 million liquidated damages provision certain markets where the Company and NDH would compete most heavily.

83.   Through unanimous written consent, the Board of Directors of Suiza voted to approve the Merger with Former Dean Foods.

**Effects of the Merger**

84.   As a result of the Merger, Dean Foods was able to establish a monopsony and foreclose access to the fluid Grade A milk bottling business in the Southeast.

85.   Throughout the negotiations leading up to the Merger, Former Dean Foods and Suiza, along with their respective boards of directors, intentionally agreed to take actions to make it appear as if the companies were making a good faith effort to satisfy the DOJ's antitrust concerns, when in reality the companies and their respective boards of directors were engaging

in anti-competitive conduct. In fact, the structure and effectuation of the Merger actually led to further consolidation and less competition in the milk market both nationally and in the Southeast. Since the Merger, Dean Foods has continued to take actions and make agreements that skirt the restrictions imposed on the Company during its formation.

86.     For each of the DOJ's requirements established during the Merger, Dean Foods had a specific plan to further the conspiracy to foreclose the milk market:

a.     ***Divestiture of 11 plants to NDH***: This divestiture did not promote competition because the disposition was not made to an independent third party that would help avoid market manipulation, but rather to a company that is owned and controlled by another member of the conspiracy. NDH, the entity to which Dean Foods divested the bottling plants, was devised by Dean and DFA and established and funded by DFA. Today, DFA has an 87.5% ownership stake in NDH and controls at least 50% of its voting shares.

b.     ***Modification of the full-supply agreement with DFA***: The modification of the supply agreement did not allow Dean Foods to buy milk from other sources in addition to DFA because of the draconian liquidated damages provision. The liquidated damages provision, agreed to by Dean Foods voluntarily, makes it economically unviable for Dean Foods to obtain milk from anyone but DFA. In reality, Dean Foods did not want to buy raw milk from any sources other than DFA. Dean Foods wanted all of the raw milk it purchased for processing to go through DFA in order to control the price it paid for raw milk.

The modification of the full-supply agreement has a profound effect on the Southeast milk market. In 1977, the DOJ imposed a consent decree upon DFA's predecessor, which decree remains in effect today against DFA, that prohibits DFA from entering into supply agreements with terms in excess of one year. In order to bypass the consent decree, Dean Foods and DFA entered into a series of 20 successive one-year agreements which grant DFA the exclusive right to supply raw milk to Dean Foods' fluid Grade A milk bottling plants in the Southeast.

c.     ***The $50 million Note given to DFA by Dean Foods as part of the payment for purchase of 33.8% of SDG:*** Dean Foods and DFA ensured that their full-supply agreement would be long-term by DFA agreeing to forgive the entire balance of the $50 million Note provided Dean Foods renews each of the 20 full-supply agreements.

d.     ***Excluding from the operation of the $50 million Note and the $47 million liquidated damages provision certain markets where the Company and NDH would compete most heavily:*** This stipulation is no concession for Dean Foods and has no practical implication because NDH is not a true competitor of Dean Foods. NDH is a subsidiary of DFA and was formed during the merger for the explicit purpose of giving DOJ the false impression that Dean Foods would have competition in the Southeast.

**Additional Actions Taken by Dean Foods Since the Merger to Illegally Manipulate and Control The Milk Market in the Southeast**

87.     Following the Merger, Dean Foods and DFA have continued to acquire fluid Grade A milk bottling plants for the purpose of increasing their dominance of the Southeast market. They have also closed down fluid Grade A milk bottling plants and/or have refused to operate fluid Grade A milk bottling plants with the purpose and effect of decreasing capacity and eliminating access to fluid Grade A milk bottling plants for dairy farmers who were not members of DFA and independent farmers who would not market their milk through one of DFA's controlled affiliates (SMA or DMS).

88.     Dean Foods has also taken predatory actions in conjunction with DFA that are indicative of the monopsony that Dean Foods has established in the Southeast fluid Grade A milk market.

89.     In late 2001 and in 2002, Dean Foods and DFA informed Maryland & Virginia Coop, a previously independent dairy cooperative, that Dean Foods' fluid Grade A milk bottling plants would no longer accept fluid Grade A milk from Maryland & Virginia Coop members because Dean Foods had established a full-supply agreement with DFA.  Maryland & Virginia Coop was further informed that the only way to obtain access to Dean Foods' and NDH's fluid Grade A milk bottling plants in the Southeast was to join SMA, a DFA affiliate.

90.     No mention was made to the members of the Maryland & Virginia Coop that: a) by joining SMA, Maryland & Virginia Coop would lose the ability to negotiate price with Dean Foods, DFA and NDH  on behalf of its members, that task now being controlled by DFA; b) SMA and DFA would flood the Southeast market with Grade A milk from the Southwest, thereby further reducing the prices received by dairy farmer members of Maryland & Virginia Coop; c) contrary to industry practice, SMA would pay the cost of transporting the Grade A milk

from the Southwest at exorbitant rates, dictate the hauler(s) to be used, and deduct the cost from

the mailbox price received by dairy farmer members of Maryland & Virginia Coop; and d) SMA

would not permit financial accountability to its members.[2]   The purpose of the activities

described in a) through d) has been to eliminate competition and to fix and stabilize prices paid

to Southeast dairy farmers for fluid Grade A milk marketed or sold to or purchased by fluid

Grade A milk bottlers.   These actions have been taken not only with the knowledge of the

Defendants, but have achieved their intent of reducing Dean Foods' cost for fluid Grade A milk.

91.     Since 2002 and continuing to the present, Dean Foods and DFA have jointly

punished a small Southeast cooperative for its refusal to join SMA by demanding, inter alia, that

DFA process Dean Foods' monthly payments to the small cooperative, thereby enabling DFA to

monitor prices paid to the small cooperative and to deduct numerous wrongful fees and expenses

from those payments.

92.     In January 2003, Dean Foods informed the independent dairy farmers in the

Southeast that were selling to the Company directly that it would no longer permit the farmers to

have direct access to its fluid Grade A milk bottling plants, but would instead require all

independent dairy farmers to market their fluid Grade A milk through DMS, a DFA affiliate, in

order to sell to their bottling plants.   DFA's conduct in the Southeast was part of a national

iniative to manipulate and control independent dairy production.   During the month of January

2003, DFA announced that all 2,500 independent dairy farmers supplying milk to Dean Foods

throughout the United States would be required to market their milk through DMS.   This action

represents another way for Dean Foods to direct milk revenues through DFA as a quid pro quo

---

[2] DFA does not provide its member farmers with a break down of the financial performance of its subsidiaries or its
joint ventures on a unit by unit basis even though the cash flow from member dairy farmers' milk sales are used for
collateral for the cooperatives' debt obligations.

for DFA to continue with the conspiracy and keep raw milk prices artificially low for the benefit of Dean Foods.

93.     At the time of DFA's January 2003 announcement, independent dairy farmers were informed only that Dean Foods was "outsourcing" certain marketing functions. No mention was made that, in fact, Dean Foods was conspiring with DFA, DMS, and SMA to fix and suppress over-order premiums paid by Dean Foods, not only to DFA member dairy farmers, but also to independent dairy farmers. The effect of these activities has been to eliminate competition and to fix and stabilize prices paid to Southeast dairy farmers for their fluid Grade A milk.

94.     In August 2006, Dean Foods, on the basis of its full-supply agreement with DFA, refused to discuss a fluid Grade A milk supply agreement with U.S. Milk, a newly-formed Southeast organization consisting of a variety of independent dairy farmers and independent cooperative members.

95.     To further ensure compliance with the conspiracy, Dean Foods and DFA require that DFA receive, process, and account for DFA-controlled marketing agencies' member cooperatives' monies from fluid Grade A milk sales. This allows DFA to monitor fluid Grade A milk sales by other Southeast cooperatives and independent dairy farmers, and allows DFA to confirm that these sales are compliant with the conspiracy to control the marketing, sale, and purchase of fluid Grade A milk by fluid Grade A milk bottlers in the Southeast.

96.     Dean Foods and DFA have agreed to use BullsEye exclusively for hauling milk in the Southeast and from the Southwest to the Southeast.   Upon information and belief, BullsEye's shipping charges are nearly twice as high as other Grade A milk haulers' rates because, upon information and belief, Baird transports unnecessarily large quantities of Grade A milk for SMA from the Southwest to the Southeast, and also transports Grade A milk

for SMA unnecessarily long distances within the Southeast.  By flooding the Southeast milk market with fluid Grade A milk produced outside of the region, Dean Foods and DFA are able to reduce the blended average price for milk, which in turn reduces the mailbox prices received by dairy farmers in the Southeast.

97.     In exchange for the extremely lucrative business provided to BullsEye by SMA, Baird informs SMA, and in turn, DFA and Dean Foods, about the amounts, origins and destinations of nearly all Grade A milk shipped in the Southeast.  As a result, Dean Foods and DFA are able to monitor the Grade A milk market from yet another angle in order to fix prices paid by bottlers for raw Grade A milk.

98.     By agreeing and requiring that all fluid Grade A milk flow through DFA or one of its affiliates to gain access to fluid Grade A milk bottling plants in the Southeast, Dean Foods and DFA have created a mechanism by which each could exchange price information and thereby monitor with the success of their conspiracy to fix, depress and stabilize the price paid to dairy farmers. This jointly enforced price monitoring mechanism ensures that each bottler can operate comfortable in the knowledge that it will not have competition on the price of fluid Grade A milk.

**Antitrust Investigation**

99.     In August of 2004, the DOJ formally launched an antitrust investigation against Dean Foods, DFA and NDH. The investigation developed momentum quickly, and this federal investigation led to state investigations around the country. Specifically, twenty state Attorneys General began to investigate antitrust violations on the state level. Eventually, the federal and state investigations narrowed their focus to activities in the Southeast because DFA had nearly absolute control over the supply of raw milk and Dean Foods, through its full-supply agreement

with DFA, was buying raw milk at prices well below market value. The federal antitrust investigation came to an end in August of 2006. The antitrust dairy team that conducted the two year investigation submitted its final recommendations to DOJ's top officials on August 28, 2006. The team recommended that the DOJ indict Dean Foods, DFA and NDH. Given the coming elections in November 2006, it was presumed that an indictment would not be issued before the election. To date, no further steps have been taken by the DOJ to pursue the recommendation to indict.

## Antitrust Litigation

100. The actions of Former Dean Foods, Suiza, Dean Foods, and DFA recounted above have led to the filling of several antitrust actions against Dean Foods, among others.[3] This class action was filed on behalf of all DFA member dairy farmers and all independent dairy farmers and independent cooperative members who produced Grade A milk for Dean Foods, DFA or one of their respective agents at any time from January 1, 2001 to the present. The class action plaintiffs allege that having unlawfully obtained control of and foreclosed access to the Southeast fluid Grade A milk bottlers, Dean Foods and DFA have used their dominance to:

> a) fix, suppress, and maintain the over-order payments fluid Grade A milk bottlers in the Southeast pay for fluid Grade A milk marketed or sold by or purchased from dairy farmers in the Southeast;

---

[3] On July 5, 2007, two similar class action antitrust complaints captioned, *Sweetwater Valley Farm, Inc., et al. v. Dean Foods Co., et al.*, Case No. 1:07-cv-0051, and *James d. Bailey, et al. v. Dean Foods Co., et al.*, No. 1:07-cv-0052 were filed in the United States District Court for the Middle District of Tennessee. Additional similar class action antitrust complaints captioned *Fidel Breto, etc. v. Dean Foods Co., et al.*, Case No. 2:07-cv-188 and *Scott Dairy Farms, Inc., et al. v. Dean Foods Co., et al.*, Case No. 2:07-208, were filed in the United States Court for the Eastern District of Tennessee on August 9, 2007 and August 27, 2007, respectively. By Order dated January 7, 2008, the United States Judicial Panel of Multidistrict Litigation transferred and centralized these cases into the Eastern District of Tennessee under the caption *In re: Southeastern Milk Antitrust Litigation*, MDL No. 1899, Master File No. 2:08-MD-1000. On April 1, 2008, the *Sweetwater, Bailey, Breto* and *Scott Dairy* actions and three other similar antitrust class actions were consolidated and/or coordinated under Master File No. 2:08-MD-1000 (the "Antitrust Litigation"). A Corrected Consolidated Amended Complaint was filed on August 4, 2008.

b) ensure that the bottlers do not have to compete, as they would in a fair market, for the price at which they buy fluid Grade A milk produced in the Southeast; and

c) ensure that Southeast dairy farmers do not have a viable alternative for selling their Grade A milk at prices above the fixed and stabilized prices established by the Dean Foods, DFA, and NDH conspiracy.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

101. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

102. Plaintiff brings this action derivatively in the right and for the benefit of Dean Foods to redress breaches of fiduciary duty by the Individual Defendants.

103. Plaintiff will adequately and fairly represent the interests of Dean Foods and its shareholders in enforcing and prosecuting its rights.

104. Plaintiff is a shareholder of Dean Foods, was a shareholder of Dean Foods at the time of the wrongdoing alleged herein, and has been a shareholder of Dean Foods continuously since that time.

105. As a result of the facts set forth herein, Plaintiff has not made any demand on the Dean Foods Board of Directors to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

106. At the time this action was commenced, the Board consisted of eleven (11) directors: defendants Engles, Collens, Davis, Green, Hardin, Hill, Kirk, Muse, Nevares, Schenkel and Turner. The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

a.  Defendants Engles, Davis, Green, Hardin, Muse, Nevares, Schenkel and
    Turner, as members of Suiza's board of directors, and Defendants Collens
    and Hill, as members of Former Dean Foods' board of directors, because
    they face a substantial likelihood of liability for breaching their fiduciary
    duties by planning and executing the Merger and the resulting transactions
    to circumvent the DOJ's antitrust concerns, of which they had actual
    knowledge, thereby initiating the antitrust conspiracy.   Accordingly,
    Defendants Engles, Davis, Green, Hardin, Muse, Nevares, Schenkel,
    Turner, Collens and Hill are incapable of disinterestedly and
    independently considering a demand to commence and vigorously
    prosecute this action.

b.  Defendants Engles, Collens, Davis, Green, Hardin, Hill, Kirk, Muse,
    Nevares, Schenkel and Turner (the entire Board), because they face a
    substantial likelihood of liability for breaching their fiduciary duties by
    taking further actions, as described hereing, to facilitate and continue the
    illegal scheme to fix fluid Grade A milk prices post the Merger, and
    therefore are incapable of disinterestedly and independently considering a
    demand to commence and vigorously prosecute this action.

c.  Defendant Engles, because Engles' principal professional occupation is
    his employment as Chief Executive Officer of the Company.  As Chief
    Executive Officer of the Company, Engles stands to earn millions of
    dollars in annual salary, bonuses, and other compensation, all of which
    must be approved by the Compensation Committee, currently comprised
    of defendants Green, Hardin, Muse and Turner.  Specifically, in 2007,
    Engles received total compensation of $8,152,798.   In 2006, Engles
    received total compensation of $11,025,493.   Accordingly, Engles is
    incapable of independently and disinterestedly considering a demand to
    commence and vigorously prosecute this action against those defendants
    who control his annual compensation.

107.  Furthermore, demand is excused because the misconduct complained of herein
was not, and could not have been, an exercise of good faith business judgment. As demonstrated
herein, the Company's Board, which was tasked with overseeing compliance with the
Company's Code of Ethics, engaged in conduct in direct violation of the Code of Ethics in the
form of anticompetitive business practices and insider sales of the Company's stock on the basis
of their knowledge of the Company's anticompetitive business practices, as well as ordering or
permitting the other Individual Defendants to cause the Company to engage in these
anticompetitive practices or sell Dean Foods stock on the basis of inside information.

108. The Individual Defendants' scheme to cause the Company to engage in illegal anticompetitive business practices cannot be a valid exercise of business judgment because it has subjected Dean Foods to potentially massive liability. Dean foods will likely suffer significant damages in resolving the Antitrust Litigation and the potential DOJ indictment, and the Individual Defendants have tarnished the Company's reputation in the investment community through this deliberate and calculated conduct.

**COUNT I**

**Against the Individual Defendants for Breach of Fiduciary Duty**

109. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

110. As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, operate the Company in a diligent, honest and prudent manner in compliance with the Company's by-laws, internal governance documents and all applicable federal and state laws, rules, regulations and requirements.

111. As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in an illegal scheme to fix prices for fluid Grade A milk through anticompetitive practices designed to restrict independent dairy farmers' access to fluid Grade A milk bottling plants.

112. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained damages, including, but not limited to the costs and expenses associated with defending the Antitrust Litigation, the costs and expenses associated with the DOJ investigation and potential indictment and reputational costs.

## COUNT II

### Against the Co-conspirator Defendants
### For Aiding and Abetting the Individual Defendants Breach of Fiduciary Duty

113.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

114.    The Co-conspirator Defendants aided and abetted the Individual Defendants' breaches of fiduciary duties by undertaking certain actions, as described herein, which permitted consummation of the Merger, but were anticompetitive in nature, and by conspiring to restrict independent dairy farmers access to fluid Grade A milk bottling plants thereby facilitating the Individual Defendants ability to cause the Company to engage in anticompetitive practices.

115.    The Individual Defendants have a fiduciary relationship with Dean Foods, and the Co-conspirator Defendants knew that the Individual Defendants were breaching their fiduciary duty to Dean Foods by causing the Company to engage in anticompetitive practices.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

C.    Appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties; and

D.    Granting such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 13, 2009.

Respectfully Submitted,

**YOUNG, WILLIAMS, KIRK & STONE, PC**

Robert Stone (BPR # 005459)
2021 First Tennessee Plaza
P. O. Box 550
Knoxville, TN  37901-0550
(865) 637-1440 (telephone)
(865) 546-9808 (facsimile)


**BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP**
Eric L. Zagar
Michael J. Hynes
J. Daniel Albert
Jesse Fuchs-Simon
280 King of Prussia Road
Radnor, PA 19106
(610) 667-7706 (telephone)
(610) 667-7056 (facsimile)

*Attorneys for Plaintiff*

# VERIFICATION

I, Richard Livermore, hereby verify that I have authorized the filing of the attached Shareholder Derivative Complaint, that I have reviewed the Shareholder Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATE: *3-29-09*

RICHARD LIVERMORE